# STATE OF MICHIGAN

# COURT OF APPEALS

---

STATE FARM FIRE AND CASUALTY
COMPANY,

        Plaintiff-Appellee,

v

DETROIT EDISON CO., also known as DTE
ELECTRIC COMPANY,

        Defendant-Appellant.

UNPUBLISHED
May 22, 2018

Nos. 332454; 333281
Sanilac Circuit Court
LC No. 14-035646-NZ

---

JANET BOTT, Individually, and the ESTATE OF
WILLIAM BOTT,

        Plaintiffs-Appellees,

v

DETROIT EDISON CO., also known as DTE
ELECTRIC COMPANY,

        Defendant-Appellant.

No. 333287
Sanilac Circuit Court
LC No. 14-035706-NF

---

Before: SERVITTO, P.J., and JANSEN and STEPHENS, JJ.

PER CURIAM.

        This is a subrogation action where plaintiff State Farm Fire and Casualty Company (State Farm) sued defendant Detroit Edison Co. (DTE) to recover the amount State Farm paid on a house insurance claim to policyholder plaintiffs William[1] and Janet Bott. In docket number 332454, DTE appeals by right the trial court's March 24, 2016 Order Denying Case Evaluation Sanctions. In docket number 333281, DTE appeals as of right the March 21, 2016 Order of Final Judgment as to State Farm and the court's May 19, 2016 Opinion and Order Regarding Motion for JNOV. In docket number 333287, DTE appeals by right the March 21, 2016 Order of Final

---

[1] Plaintiff William Bott died during these proceedings on August 23, 2013.

Judgment as to Plaintiffs Janet Bott and the Estate of William Bott, and the court's May 19, 2016 Opinion and Order Regarding Motion for JNOV. This Court consolidated all three cases on June 16, 2016.[2] We affirm in part, reverse in part, and remand.

## I. BACKGROUND

The Botts' home and contents were lost in a fire on July 5, 2011. The fire occurred after a storm on July 2, 2011, that caused a tree to fall onto the Botts' electrical service line, bending the utility pole and pulling the meter box off the Botts' home. The Botts made multiple phone calls following the storm to DTE informing it of the known damage. It was later learned that the force of the tree also caused the "neutral wire" inside the meter box to become dislodged. The dislodgment created what is known as an "open neutral" condition. On July 5, 2011, when DTE reenergized its primary circuit to restore power to the over 100,000 customers who lost it during the storm, because of the open neutral condition, an excessive amount of electricity entered the Botts' home, the Botts' power strip failed, and a fire resulted.

State Farm was the insurer of the Botts' home. The Botts' insurance policy provided coverage for structural damage, personal property loss, and additional living expenses. The Botts made insurance claims as to each of these categories and were paid a total of $374,397.17 under the policy after the resolution of a lawsuit against State Farm. During the pendency of their lawsuit against their insurer, the Botts filed a negligence action against DTE claiming that the utilities' management of the process of reenergizing the power to their home was negligent in several ways.

On May 16, 2014, State Farm filed a negligence action against DTE as the Botts' subrogee for the paid claim also, claiming that the fire was the result of DTE's negligence in managing the reenergizing process. The court consolidated both the subrogation claim and the Botts' direct claim. DTE denied liability for any damage to the Botts' home and alleged the damage was due to the negligence of the Botts' electrician in installing the neutral wire years before. Subsequently, the Botts were allowed to amend their complaint and add a count of Intentional Infliction of Emotional Distress.[3] In the ordinary course of litigation, the matter was submitted to case evaluation. Separate awards were given to the plaintiffs. DTE accepted both awards and both plaintiffs rejected the awards.

The court made several very significant pre-trial rulings. Partial summary disposition was granted in favor of State Farm as to breach of duty and proximate cause. Two of DTE's experts, James L. Brown and William Peck, were excluded from testifying regarding how the neutral wire separated. DTE failed in its attempt to limit the Botts' damages claim and was denied spoliation sanctions against State Farm for its claim that State Farm failed to preserve

---

[2] *State Farm and Casualty Company v Detroit Edison Company; Janet Bott v Detroit Edison Company,* unpublished order of the Court of Appeals, issued June 16, 2016 (Docket Nos. 332454, 333281, 333287).

[3] DTE immediately challenged the addition of the claim with a motion for summary disposition that was granted by the court, and is not challenged on appeal.

certain damaged electrical equipment belonging to the Botts for its experts to inspect. Mid-trial, DTE's expert David Eby was precluded from testifying regarding certain force testing done by him. Numerous witnesses testified at trial and the jury awarded $156,096.79 to State Farm and $75,109.15 to the Botts.

State Farm filed a post-trial motion for sanctions related to DTE's pretrial responses to requests for admission (RFAs) that was granted. DTE countered that it was entitled to case evaluation sanctions as the prevailing party because State Farm was awarded less than 110% more than the rejected case evaluation award. The court issued judgments for the Botts and State Farm separately. The court found State Farm was entitled to costs related to DTE's improper denials of RFAs, and that when those costs were added to the State Farm judgment State Farm was the prevailing party then also, entitled to case evaluation sanctions. The court denied DTE's motions for a new trial and remittitur. These three appeals followed.

## II. PRE-TRIAL RULINGS

### A. PARTIAL SUMMARY DISPOSITION OF STATE FARM'S NEGLIGENCE CLAIM

#### 1. STANDARD OF REVIEW

We review de novo the trial court's decision to grant or deny a motion for summary disposition. *Adair v State*, 470 Mich 105, 119; 680 NW2d 386 (2004). State Farm moved for partial summary disposition of the elements of its negligence claim against DTE under MCR 2.116(C)(8) and (10). However, because the court considered documents outside the pleadings, the grant of summary disposition was pursuant to MCR 2.116(C)(10) only. *Spiek v Michigan Dep't of Transp*, 456 Mich 331, 338; 572 NW2d 201 (1998).

"MCR 2.116(C)(10) tests the factual support of a plaintiff's claim. The court considers the affidavits, pleadings, depositions, admissions, and other documentary evidence submitted or filed in the action to determine whether a genuine issue of any material fact exists to warrant a trial." *Id*. at 337. "A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ." *West v Gen Motors Corp*, 469 Mich. 177, 183; 665 NW2d 468 (2003). "The court is not permitted to assess credibility, or to determine facts on a motion for summary judgment." *Skinner v Square D Co*, 445 Mich 153, 161; 516 NW2d 475 (1994). Like the trial court, we give the benefit of reasonable doubt and make all legitimate inferences in favor of the nonmoving party. *Id*. at 162.

#### 2. ANALYSIS

The necessary elements to prove in every case of negligence are: "(1) a duty owed by the defendant to the plaintiff, (2) a breach of that duty, (3) causation, and (4) damages." *Case v Consumers Power Co*, 463 Mich 1, 6; 615 NW2d 17 (2000). "[P]ursuant to its duty, a power company has an obligation to reasonably inspect and repair wires and other instrumentalities in order to discover and remedy hazards and defects." *Schultz v Consumers Power Co*, 443 Mich 445, 451; 506 NW2d 175 (1993). "[A] company that maintains and employs energized power lines must exercise reasonable care to reduce potential hazards as far as practicable." *Id*. "The degree of care required is that used by prudent persons in the industry, under like conditions and

-3-

proportionate to the dangers involved, to guard against reasonably foreseeable or anticipated contingencies." *Id*. at 454. "[A]lthough a reasonable person can be charged with the knowledge of certain fundamental facts and laws of nature that are part of the universal human experience, such as the dangerous properties of electricity, it is well settled that electricity possesses inherently dangerous properties requiring expertise in dealing with its phenomena." *Id*. at 451 (citations omitted). "The scope of the duty owed by electrical companies to move, insulate or deenergize overhead power lines is a question of foreseeability. Utility companies, particularly electric companies are charged with a duty to protect against foreseeable harm." *Groncki v Detroit Edison Co*, 453 Mich 644, 654; 557 NW2d 289 (1996); (citation omitted). "Whether a duty exists to protect a person from a reasonably foreseeable harm is a question of law for the court." *Maiden v Rozwood*, 461 Mich 109, 131; 597 NW2d 817 (1999).

State Farm's motion for partial summary disposition sought judgment on its claims that DTE had knowledge of the condition at the Botts' residence and failed to respond before reenergizing the circuit. Timothy McMasters, a journeyman lineman and retired DTE employee, unequivocally testified that DTE had a responsibility to investigate any report of its equipment being damaged before it reenergized the equipment. According to McMasters, under catastrophic storm conditions, homes that suffered separate damage, like the Botts, were to be disconnected from DTE's system if DTE knew the condition existed. Per the Job Chronology created for the Botts' reports of damages, DTE was made aware of the condition at the Botts' residence on four separate occasions through phone calls that were placed to DTE by the Botts between July 2 and July 5, 2011. McMasters testified that while the persons dispatched by DTE to patrol the area may not have seen that the downed pole was connected to a service line from the road, a follow-up from DTE's repair crew should have inspected the damage before DTE reenergized the home. He averred that if DTE received a report that the mast and the meter were ripped from the house and the meter was broken, DTE should have inspected its equipment to ensure that it had a good neutral to the house before reenergizing. Thus, McMaster's testimony supported that DTE breached its duty to the homeowners.

DTE also, challenges the court's rulings on proximate cause, both as to foreseeability and cause in fact. DTE argues that the court erroneously concluded that the testimony of McMasters was sufficient to determine that there was no material question of fact on foreseeability. DTE further asserts that the court erred on its grant of partial summary disposition on the issue of cause in fact because the ruling was a result of both an erroneous denial of sanctions against State farm for spoliation of evidence and the exclusion of DTE's experts Brown and Peck. We will address each of these arguments separately.

We begin with foreseeability. " '[P]roximate cause normally involves examining the foreseeability of consequences, and whether a defendant should be held legally responsible for such consequences." *Skinner v Square D Co*, 445 Mich 153, 163; 516 NW2d 475 (1994). As a public utility, DTE was charged with the duty to protect against reasonably foreseeable harm. *Groncki*, 453 Mich at 654; *Maiden*, 461 Mich at 131. The issue of foreseeability was decided based upon the testimony of McMasters. McMasters testified that the safety concerns posed by reenergizing the circuit before inspecting the damage were "potential damage to the house or to the public," possible fire in the house, and possible electrocution of the homeowners. DTE correctly states that State Farm bore the burden of proof, commonly referred to as the burden of going forward on the issue of foreseeability. A review of the record reveals that DTE did not

offer any competent contrary evidence on foreseeability at or before the hearing on the motion and that discovery was closed as of that time. "As a general rule, summary disposition is premature if granted before discovery on a disputed issue is complete." *Dep't of Social Services v Aetna Casualty & Surety Co*, 177 Mich App 440, 446; 443 NW2d 420 (1989). In this case, the court's September 5, 2014 scheduling order provided that discovery was complete as of March 9, 2015. Partial summary disposition was granted after that date, on March 16, 2015. Discovery was extended until April 23, 2015, only as the Botts' added claim of intentional infliction of emotional distress as DTE's counsel acknowledged on the record.[4] Thus the court correctly accepted the testimony of McMasters and granted partial summary disposition on the foreseeability aspect of proximate cause.

## B. DTE'S SPOLIATION CLAIM FOR SANCTIONS

### 1. STANDARD OF REVIEW

DTE claims that State Farm should have been sanctioned with at least a negative inference for spoliation of key evidence. Such an inference would have defeated a motion for summary disposition on the issue of causation in fact for the fire at the Botts' home. We review for an abuse of discretion the trial court's decision to grant or deny a motion to sanction a party for spoliation of evidence. *Brenner v Kolk*, 226 Mich App 149, 160-161; 573 NW2d 65 (1997). An abuse of discretion occurs when the trial court's decision is outside the range of reasonable and principled outcomes. *Maldonado v Ford Motor Co*, 476 Mich 372, 388; 719 NW2d 809 (2006).

### 2. ANALYSIS

"A trial court has the authority, derived from its inherent powers, to sanction a party for failing to preserve evidence that it knows or should know is relevant before litigation is commenced." *Bloemendaal v Town & Country Sports Ctr, Inc*, 255 Mich App 207, 211; 659 NW2d 684 (2002). Spoliation of evidence occurs when evidence is destroyed, mutilated, altered or concealed. Black's Law Dictionary (9 ed). "Generally, where a party deliberately destroys evidence, or fails to produce it, courts presume that the evidence would operate against the party who destroyed it or failed to produce it." *Hamann v Ridge Tool Co*, 213 Mich App 252, 255; 539 NW2d 753 (1995). "It is well settled that missing evidence gives rise to an adverse presumption only when the complaining party can establish intentional conduct indicating fraud and a desire to destroy evidence and thereby suppress the truth." *Ward v Consol Rail Corp*, 472 Mich 77, 84; 693 NW2d 366 (2005) (quotation marks and brackets omitted).

---

[4] DTE's reference to trial proofs, specifically Charles Fricke's trial testimony, in order to make a hindsight argument that the court's grant of partial summary disposition was premature, will not be considered by this Court. "[A]ppellate review of the trial court's decision is limited to the evidence that had been presented at the time the motion was decided." *Gorman v Am Honda Motor Co, Inc*, 302 Mich App 113, 120; 839 NW2d 223 (2013).

There is no evidence that State Farm destroyed, mutilated, altered or concealed evidence. State Farm notified DTE of fire scene evidence inspections in July 2011 and August 2012.[5] DTE sent two representatives to each inspection who were able to investigate, collect, and take multiple photographs of the evidence. DTE's primary contention concerns the condition of the power strip, DVD player, VCR and television at the second inspection in August 2012. DTE expert investigator William Peck testified that when he inspected the items in August 2012 they were wet, and covered with mold, mildew and fungi. DTE argues that State Farm's expert investigator Charles Fricke's failed to comply with the guidelines for evidence storage under National Fire Protection Association 921 (NFPA 921) § 16.8.3, which provides that,

> [p]hysical evidence should be maintained in the best possible condition until it is no longer needed. It should always be protected from loss, contamination, and degradation. Heat, sunlight, and moisture are the chief resources of degradation of most kinds of evidence. Dry and dark conditions are preferred, and the cooler the better. Opening of sealed evidence bags containing evidence not intended for accelerant testing will allow moisture to evaporate, will better preserve metallic items, and can prevent molding of organic items such as wet clothing . . .

Peck opined that Fricke should have opened the wrapping once the items reached the facility to allow aeration. DTE contends that Fricke's failure to do this resulted in spoliation of the evidence.

We find this argument to be without merit. While it would have been prudent for State Farm to follow NFPA 921 and open the cellophane once the items arrived at the facility to prevent degradation from moisture, the inverse – that degradation from moisture would not have occurred if the package were aerated – is not correct. DTE waited over a year to have its expert inspect the Botts' electrical equipment despite the wet, charred and crumbling state of the items at the July 2011 inspection. Given the passage of over one year's time, it was pure speculation to assume that the items would have been in their same condition, would not have been brittle, and would not have been moldy if the cellophane had been opened. In other words, DTE cannot show that Peck would have been able to conduct any better of an investigation of the Botts' equipment had State Farm followed the NFPA 921. At the October 2015 motion hearing, DTE conceded that Peck was able to retrieve enough evidence from the power strip to determine that it was faulty and that its surge protector was not working. Accordingly, whether the television, DVD player or VCR were defective is irrelevant and because Peck was able to formulate an opinion as to the power strip, DTE cannot argue spoliation of that item. DTE's remaining argument, that it was denied arguing a non-party at fault because it could not tell who the

---

[5] DTE argues that between the first and second inspection, the "items were wholly incapable of being analyzed in any meaningful way," however, it offers no evidence to support its assertion. For this reason, the facts here are dissimilar to those presented in *Citizens Ins Co of America v Juno Lighting, Inc*, 247 Mich App 236, 238; 635 NW2d 379.

manufacturer of the power strip was, is also without merit because DTE still could have, but chose not to, file notice under MCR 2.112(K)(3)(b) of an unknown non-party manufacturer.[6]

## C. THE EXCLUSION OF LIABILITY EXPERT TESTIMONY FROM DTE WITNESSES BROWN AND PECK

### 1. STANDARD OF REVIEW

Putative experts Brown and Peck opined that the cause in fact of the Botts' fire was faulty electrical wiring not the actions or inactions of DTE. DTE argues that the court's error in excluding these witnesses deprived DTE of competent evidence to rebut State Farm's evidence on cause in fact. "A trial court's decision to admit or exclude evidence is reviewed for an abuse of discretion. An abuse of discretion occurs when the trial court chooses an outcome falling outside the range of principled outcomes." *Edry v Adelman*, 486 Mich 634, 639; 786 NW2d 567 (2010) (citations omitted).

The trial court's interpretation of a court rule is reviewed de novo. *Wilcoxon v Wayne Co Neighborhood Legal Servs*, 252 Mich App 549, 553; 652 NW2d 851 (2002).

### 2. ANALYSIS

MRE 702 governs the admission of expert testimony at trial. It provides that

> [i]f the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case. [MRE 702].

Plainly read, MRE 702 establishes a three-part test for the admissibility of expert testimony. First, the expert must be qualified. *Craig ex rel Craig v Oakwood Hosp*, 471 Mich 67, 78; 684 NW2d 296 (2004). Second, the testimony must "assist the trier of fact to understand the evidence or to determine a fact in issue...." MRE 702. Third, "the evidence must be from a recognized discipline." *People v Beckley*, 434 Mich 691, 711; 456 NW2d 391 (1990). Under the rule, expert opinion is limited to scientific, technical or specialized knowledge that will assist the trier of fact. The trial court is required "to ensure that each aspect of an expert witness's proffered testimony—including the data underlying the expert's theories and the methodology by which the expert draws conclusions from that data—is reliable." *Gilbert v DaimlerChrysler Corp*, 470 Mich 749, 779; 685 NW2d 391 (2004). "To determine whether the requisite standard

---

[6] See *Rinke v Potrzebowski*, 254 Mich App 411, 416; 657 NW2d 169 (2002) ([T]he language of [MCR 2.112(K)(3)(b)] is clear: The defendant is not required to specifically identify the nonparty, but only to identify the nonparty as best he can.").

of reliability has been met, the court must determine whether the proposed testimony is derived from 'recognized scientific knowledge.' " *Nelson v Am Sterilizer Co*, 223 Mich App 485, 491; 566 NW2d 671 (1997). "[I]n order to qualify as 'scientific knowledge,' an inference or assertion must be derived by the scientific method." *Daubert v Merrell Dow Pharm, Inc*, 509 US 579, 590; 113 S Ct 2786; 125 L Ed 2d 469 (1993). The scientific method involves "generating hypotheses and testing them to see if they can be falsified." *Id*. at 593 (quotation omitted). "Additionally, the inferences or assertions must be supported by appropriate objective and independent validation based on what is known, e.g., scientific and medical literature." *Nelson*, 223 Mich App at 491. The proponent of the evidence bears the burden of establishing its relevance and admissibility. *People v Crawford,* 458 Mich 376, 388 n 6; 582 NW2d 785 (1998).

MCL 600.2955 poses similar requirements. In pertinent part, the statute provides:

(1) In an action for the death of a person or for injury to a person or property, a scientific opinion rendered by an otherwise qualified expert is not admissible unless the court determines that the opinion is reliable and will assist the trier of fact. In making that determination, the court shall examine the opinion and the basis for the opinion, which basis includes the facts, technique, methodology, and reasoning relied on by the expert, and shall consider all of the following factors:

(a) Whether the opinion and its basis have been subjected to scientific testing and replication.

(b) Whether the opinion and its basis have been subjected to peer review publication.

(c) The existence and maintenance of generally accepted standards governing the application and interpretation of a methodology or technique and whether the opinion and its basis are consistent with those standards.

(d) The known or potential error rate of the opinion and its basis.

(e) The degree to which the opinion and its basis are generally accepted within the relevant expert community. As used in this subdivision, "relevant expert community" means individuals who are knowledgeable in the field of study and are gainfully employed applying that knowledge on the free market.

(f) Whether the basis for the opinion is reliable and whether experts in that field would rely on the same basis to reach the type of opinion being proffered.

(g) Whether the opinion or methodology is relied upon by experts outside of the context of litigation.

(2) A novel methodology or form of scientific evidence may be admitted into evidence only if its proponent establishes that it has achieved general scientific acceptance among impartial and disinterested experts in the field. [MCL 600.2955(1), (2)].

The court excluded testimony from DTE's electrical engineer James Brown because it was not based on reliable, scientific information. The court's decision was not an abuse of discretion. Brown's expert opinion was initially that "the neutral connection between the Botts' service entrance wire and the block in the meter box may not have been sufficiently torqued by the Botts' electrical contractor." Later, Brown refined his opinion to state that the Botts' neutral wire was improperly installed because the wire was not sufficiently inserted under the set screw and the improper installation allowed detachment of the wire. Brown admitted both opinions were formulated without testing and were based on his visual examinations of the electrical equipment and experience in the past with other meters that had pulled away from a home because of a fallen tree on the service drop. Brown repeatedly asserted that testing was not necessary, because "he could tell," "he knew," or he was "extremely confident."

When State Farm challenged the basis for Brown's opinions by motion in limine, the court ordered DTE to conduct a *Daubert* deposition of Brown. One week prior to that deposition, Brown conducted set screw depth testing. In that testing, Brown inserted a set screw into a neutral wire and observed the wire for movement at different depths. The parties do not contest that the screw and wire were reasonably similar to those at the Botts' home. Brown concluded that a wire inserted only halfway under the set screw resulted in an improper connection and would not have the mechanical strength to withstand the event of the meter being pulled from the house as a result of the tree falling on the service drop.

Contrary to DTE's argument, the trial court did not strike Brown's testimony because DTE failed to recreate the storm and the event of the tree falling. Rather, Brown's testimony was excluded because portions of his opinion lacked sufficient scientific support for his methodology or his opinions. As the court noted, although Brown offered an opinion as to the set screw's mechanical strength, he did not conduct any pull-out testing to support his opinion. Similarly, while Brown's hypothesis was dependent on a properly installed neutral being able to withstand the pull from the downed service drop, he did not perform any testing regarding the force required to detach either a properly or improperly installed neutral wire from the meter box. Further, he opined that the set screw may not have been sufficiently torqued by the Botts' electrician, but conducted no torque testing. When asked why he did not perform certain other tests, Brown's answer was:

> I could have performed all kinds of tests but . . . my objective was to, you know, was based on recognizing the fact that the connection was deficient and to verify that based on what we observed on the Botts's neutral wire that . . . it was assembled in a way that it created a deficient connection.

Consequently, the testing that Brown did perform was not to test his hypothesis, but to prove it:

> The whole point of my testing was for me to confirm my opinion that, you know, based – based on having visually examined the end of the Bott neutral conductor, and the deformation that I viewed, I wanted to confirm that my conclusion that the conductor was only approximately halfway, only inserted about half the diameter of the set screw beneath that set screw and that the neutral connection was not properly assembled.

Admittedly, Brown did not test alternative hypotheses to learn whether his opinions could be falsified, nor did he subject his testing to the review of other engineers. See MCL 600.2955(1)(a) and (b). The testing of alternative hypotheses and submission to peer review would have been helpful in this case where Brown's opinions were less than solid. Further, "submission to the scrutiny of the scientific community is a component of 'good science,' in part because it increases the likelihood that substantive flaws in methodology will be detected." *Daubert*, 509 US at 593-594. Brown waivered in his opinions regarding the mechanical strength of a properly installed neutral wire and what the witness marks in the saddle represented. For example, although Brown opined that, had the wire been properly installed it would have had the sufficient mechanical integrity or "strength to withstand the forces of the tree falling down," he also testified that given enough force, even a properly installed neutral could be pulled from the meter box and create an open neutral condition. In another example, Brown was asked what the "error rate" was for his opinion and answered that, without "putting a specific number on it," "the witness marks and deformation provide a very high level of confidence in where the conductor was positioned beneath the set screw." However, he also testified that the witness marks "could have been just a scraping mark of the conductor as it was initially inserted into the connecter body, or . . . if it slid back out a little bit, it could be rubbing against the surface."

Brown's testimony was not based on reliable principles or methods. MRE 702. The sole testing Brown did perform was insufficient to support his opinions as to force, pull-out and torque. He believed the scientific method did not have to be followed in every instance to render an opinion. There was no evidence as to the general scientific acceptance of his testing method. To determine whether an expert's testimony "will assist the trier of fact to understand the evidence or to determine a fact in issue," MRE 702, the court conducts "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue," *Daubert*, 509 US at 592-593. "Unless information requiring expert interpretation actually goes through the crucible of analysis by a qualified expert, it is of little assistance to the jury and therefore inadmissible under MRE 702[.]" *Gilbert*, 470 Mich at 790. Here, because Brown relied on his own knowledge, there was no underlying reasoning or methodology for Brown's testing that the court could assess. Therefore, the court did not abuse its discretion in excluding Brown's expert opinion regarding installation of the neutral wire.

Peck was also of the opinion that the neutral wire was improperly installed by the Botts' electrician. DTE argued Peck's deposition testimony confirmed Brown's opinions. Similarly, Peck's opinion was based on his physical observation of an "inadequate connection of the Bott neutral to the meter block." Specifically, he testified that the neutral wire was only "an eighth of an inch" under its securing bolt. Peck's opinions were also formulated without any pull-out, force or torque testing. Thus, the court did not abuse its discretion in also excluding Peck's expert testimony on the installation of the neutral wire.

DTE argues that the exclusion of Brown's and Peck's testimonies about the neutral wire's improper installation deprived it of an absolute defense. Brown's and Peck's opinions were challenged months before the start of trial by a motion in limine. At that time, DTE was aware that its experts' opinions were being attacked under MRE 702 for lack of supportive testing and failure to employ the scientific method. DTE chose not to do any additional testing or to file the notice of non-party fault against the Botts' electrical contractor. Having made no

error in excluding Brown and Peck, denying spoliation sanctions, and accepting McMasters' testimony, the court correctly ruled that there was no material question of fact as to proximate causation.

## III.  IN TRIAL RULINGS

### A.  THE EXCLUSION OF LIABILITY EXPERT TESTIMONY FROM DTE WITNESS EBY

#### 1.  STANDARD OF REVIEW

"A trial court's decision to admit or exclude evidence is reviewed for an abuse of discretion. An abuse of discretion occurs when the trial court chooses an outcome falling outside the range of principled outcomes." *Edry*, 486 Mich at 639 (citations omitted).

#### 2.  ANALYSIS

In the middle of the second day of trial, DTE requested an opportunity to conduct pullout testing and then present the results as part of its case in chief. The court denied the request. The court ruled that it would not allow any further testing at that point. It explained that it was in the middle of trial, that DTE knew the pull-out testing would be an issue for cross-examination, and that the court would never finish this case if it allowed DTE to do additional testing and then State Farm its own testing, and so on. Nevertheless, DTE consulted with senior mechanical engineer expert Dr. David Eby to conduct testing to determine the force required to separate a neutral wire from a set screw in an electrical box. It then attempted to offer Eby's affidavit to the court, which was again denied. The court noted that they were beyond opening statements, State Farm's expert had already testified, Eby was not on DTE's witness list, and DTE conducted its testing in secret. The court held "from a procedural standpoint, from a matter of fairness," the testimony would be "extremely prejudicial and very slightly probative." The court also reasoned that Eby's testing only represented one component of DTE's theory and that it still did not know the torque of the bolt or the full situation in which the testing was applied. Given these circumstances, we cannot find that the court's ruling to exclude Eby's belated testimony was outside the range of principled outcomes.

### B.  DAMAGES

#### 1.  DTE'S MOTION TO LIMIT THE BOTTS' HOURS AND MILEAGE CLAIM

##### A.  STANDARD OF REVIEW

A trial court's decision to admit evidence is reviewed for an abuse of discretion. *Barnett v Hidalgo*, 478 Mich 151, 158-159; 732 NW2d 472 (2007). An abuse of discretion occurs when the decision results in an outcome falling outside the range of principled outcomes. *Id*. at 158.

##### B.  ANALYSIS

DTE filed a motion in limine to limit or exclude Mrs. Bott's testimony regarding the hours and mileage spent toward rebuilding the Botts' home. DTE contended that pursuant to *Price v High Pointe Pol Co, Inc*, 493 Mich 238; 828 NW2d 660 (2013), the Botts could not

recover non-economic damages for a claim of negligent destruction of property. The court responded that it would take up the issue at trial when the question was presented. At trial, direct examination of Mrs. Bott as to her claims for mileage and hours provoked an objection by DTE to voir dire the witness as to her lack of documentation to support her claims. Thereafter, the court ruled that *Price* did not preclude the Botts' claim for mileage or hours:

> if they [were] natural and legal consequences of the tort-feasors action. Mileage and hours are economic damages, not noneconomic damages. Further as to her ability to testify that goes to the weight of her testimony, not it's admissibility, so the objection is overruled.

*Price* determined that noneconomic damages were not recoverable for the negligent destruction of real property. 493 Mich at 264. It defined a "noneconomic harm" as one that "cannot be precisely quantified." 493 Mich at 262-263. By contrast, economic damages are those that are easily verifiable, quantifiable, and measurable. *Id*. at 261-262. The Botts' claim for mileage and hours met the definition for a claim of economic damages.

Mrs. Bott testified that she compiled a list of the time and mileage she believed was spent over a seven-month period from July 2011 to February 2012 to rebuild their home. The mileage claim was configured by multiplying miles traveled by fifty-five cents per mile. The testimony met the requirements for admissibility under the rules of evidence and was subject to cross-examination, including impeachment for prior inconsistent statements. The hours' claim was based on the amount of hours estimated per week the Botts spent rebuilding their home multiplied by the amount Mrs. Bott received in her previous employment and thus was not speculative. Viewing the testimony in a light most favorable to the Botts with all legitimate inferences drawn in their favor, we conclude that, "reasonable jurors could have honestly reached different conclusions, [thus,] the jury verdict must stand." *Morinelli v Provident Life & Acc Ins Co*, 242 Mich App 255, 260-261; 617 NW2d 777 (2000).

## 2. EXCLUSION OF DTE DAMAGES EXPERT TESTIMONY

### A. STANDARD OF REVIEW

"A trial court's decision to admit or exclude evidence is reviewed for an abuse of discretion. An abuse of discretion occurs when the trial court chooses an outcome falling outside the range of principled outcomes." *Edry*, 486 Mich at 639 (citations omitted).

### B. ANALYSIS

DTE argues that the court erred in striking its damages expert Kurt Weymouth's testimony as to property appraisal and fair market value. We disagree. During voir dire, Weymouth admitted that before the instant case, he consistently employed the costs minus depreciation method to calculate fair market value for insurance companies. He testified that he used the same method of valuation when he was employed by State Farm, and had only used his new approach of comparing Turbo Tax, Charitable Deductions and eBay for six months and only on cases involving DTE. He also conceded that outside of himself and his employer, he did not know of a single appraiser, estimator, or adjustor who had ever used the methodology he proposed to the court. He admitted his method was not published or peer reviewed. He was also

unable to do a comparative analysis between the condition and age of items in the databases he relied on. Under MRE 702, his testimony was not based on sufficient facts or data and was not the product of reliable principles and methods. Under MCL 600.2955, his methods had not been subjected to peer review or error rate testing, were not generally accepted by impartial and disinterested experts in the field, and were not relied on outside of litigation. The court's exclusion of his testimony was therefore, within the range of principled outcomes.

### 3. CLAIMS OF INSTRUCTIONAL ERROR

#### A. STANDARD OF REVIEW

Claims of instructional error are reviewed de novo. *Jimkoski v Shupe*, 282 Mich App 1, 9; 763 NW2d 1 (2008). "We review for an abuse of discretion the trial court's decision regarding supplemental jury instructions." *Guerrero v Smith*, 280 Mich App 647, 660; 761 NW2d 723 (2008). "[A]n abuse of discretion standard acknowledges that there will be circumstances in which there will be no single correct outcome; rather, there will be more than one reasonable and principled outcome." *People v Babcock*, 469 Mich 247, 269; 666 NW2d 231 (2003). "When the trial court selects one of these principled outcomes, the trial court has not abused its discretion and, thus, it is proper for the reviewing court to defer to the trial court's judgment." *Id*. We "will not reverse a court's decision regarding supplemental instructions unless failure to vacate the verdict would be inconsistent with substantial justice." *Grow v WA Thomas Co*, 236 Mich App 696, 702; 601 NW2d 426 (1999).

#### B. ANALYSIS

DTE argues the trial court erred by giving the jury State Farm's Special Instruction #3 which instructed the jury that replacement cost less depreciation was an acceptable method of determining fair market value.

DTE relies on *Price v High Pointe Pol Co, Inc*, *supra*, to argue that the only way to measure for damages in property damage cases is the fair market value of the property immediately before the occurrence. The issue in *Price* was whether noneconomic damages were recoverable for the negligent destruction of real property.[7] Our Supreme Court held they were not, and reiterated the common law in Michigan, "that the appropriate measure of damages in cases involving the negligent destruction of property is simply the cost of replacement or repair of the property." 493 Mich at 240.

State Farm relies on *Strzelecki v Blaser's Lakeside Indus of Rice Lake, Inc*, 133 Mich App 191, 193; 348 NW2d 311 (1984), to argue that replacement cost less depreciation is an

---

[7] In *Price*, the plaintiff's home and many belongings were ruined after the defendant pumped more than 400 gallons of oil into a non-working oil fill pipe. Between the plaintiff's and defendant's insurers, the plaintiff's house was rebuilt, her personal property was cleaned or repaired and she was reimbursed for temporary-housing-related expenses. The plaintiff pursued non-economic damages related to the negligent destruction of her property and was awarded $100,000. *Price*, 493 Mich at 241-242.

appropriate method for measuring damages in property damage claims.[8]  The issue in *Strzelecki* was precisely, "[w]hether the replacement cost less depreciation method of valuation may suffice as prima facie proof of market value at the time of the loss."  133 Mich App at 194.  The Court acknowledged the common law rule of damages for property loss from *O'Donnell v Oliver Iron Mining Co*, 262 Mich 470; 247 NW 720 (1933).  *Id.* at 193-194.  It also acknowledged the multiple methods by which the market value of damaged property could be established.  It explained that the "[m]easure of market value through pre-injury appraisals (if any), the original purchase price of the property, the valuation of the home for tax assessment purposes, or the selling price of similar homes, are not necessarily more accurate methods than replacement cost less depreciation."  *Strzelecki*, 133 Mich App at 197.  *Strzelecki* concluded that the "plaintiffs' proof of damages based on the replacement cost less depreciation of the home and personal property destroyed by the fire was sufficient to present prima facie proof of the amount of damages[.]"  *Id.* at 198.

Here, the court decided that *Price* did not preclude the method of determining fair market value used in *Strzelecki*.  It therefore instructed the jury that it could establish the fair market value of the damaged property to measure damages under M Civ JI 51.04, according to "the fair market value of the property immediately before the occurrence" and under State Farm's Special Instruction No. 3, by "the cost of replacement minus depreciation."  The court decided that both instructions could be given because State Farm's proposed special instruction did not conflict with M Civ JI 51.04.  The court's decision was not erroneous.

Under MCR 2.512(B), the court is required to instruct the jury on the applicable law, the issues presented, and if requested, a party's theory of the case.  The court is not limited to the model civil jury instructions however, and may give additional instructions when they apply.  MCR 2.512(D)(4).  Our Supreme Court decided *Price* in 2013, while *Strzelecki* was decided many years earlier in 1984.  *Price* acknowledged *Strzelecki* as one of the many cases that followed the rule in *O'Donnell* that the "measure of damages is [the] difference in its market value before and after said injury."  262 Mich at 471.  However, *Price* did not provide the method by which the difference in market value was to be obtained and *Strzelecki* recognized that there were multiple methods of valuation.[9]  In comparing the replacement costs less depreciation method to other methods, *Strzelecki* held, "[t]o the extent methods other than replacement cost less depreciation might be more reliable based on the particular facts of the case, defendants are free to introduce other proofs and so argue; the weight to be given the

---

[8] In *Strzelecki*, the plaintiff's home and contents were completely destroyed by a fire due to a defective wood stove.  The plaintiff's losses were partially covered by an insurance policy.  The plaintiff's insurer sued the manufacturer and seller of the stove in subrogation.  133 Mich App at 192-193.

[9] See *Xerox Corp v Oakland Co*, 157 Mich App 640, 643; 403 NW2d 188 (1987) ("In *Antisdale v. Galesburg*, 420 Mich. 265, 276, 362 N.W.2d 632 (1984), the Michigan Supreme Court identified three generally accepted methods of valuation to determine true cash value or fair market value of property for tax assessment purposes: the cost-less-depreciation approach, the capitalization-of-income approach and the market approach."

evidence is a matter for the fact finder." 133 Mich App at 197-198. The same rings true here. The court did not exclude any one method, but submitted both for the jury to consider. Its decision to instruct the jury under M Civ JI 51.04 was based on the applicable law in *Price*, while its decision to instruct the jury under State Farm's Special Instruction was based on the applicable law in *Strzelecki*. DTE has not shown that the court was confined to instructing one method over the other or that *Price* discouraged the methods considered in *Strzelecki*. Instructing the jury as to both methods was a reasonable and principled outcome given the facts presented and we cannot find that the court abused its discretion in allowing both methods to be considered. In this case, "it is proper for [this Court] to defer to the trial court's judgment." *Babcock*, 469 Mich at 269.

## IV. POST-TRIAL RULINGS

### A. STATE FARM'S REQUEST FOR ADMISSION SANCTIONS

#### 1. STANDARD OF REVIEW

"We review under an abuse of discretion standard a court's decision to award sanctions against a party for denying a request to admit that which is proved at trial." *Phinisee v Rogers*, 229 Mich App 547, 561–562; 582 NW2d 852 (1998). "An abuse of discretion occurs when the trial court's decision is outside the range of reasonable and principled outcomes." *Kalaj v Khan*, 295 Mich App 420, 425; 820 NW2d 223 (2012). "We review any factual findings underlying the trial court's order for clear error." *Hardrick v Auto Club Ins Ass'n*, 294 Mich App 651, 660; 819 NW2d 28 (2011). "A finding is clearly erroneous when this Court is left with a definite and firm conviction that a mistake has been made." *Id*. (quotation marks and citation omitted). The "interpretation of a court rule, like a matter of statutory interpretation, is a question of law that this Court reviews de novo." *CAM Constr v Lake Edgewood Condo Ass'n*, 465 Mich 549, 553; 640 NW2d 256 (2002).

#### 2. ANALYSIS

This Court lacks jurisdiction to review DTE's challenges to the trial court's February 22 and 24, 2016 orders granting State Farm sanctions for DTE's RFA responses. MCR 7.202(6)(a)(iv); MCR 7.203(A)(1). We have jurisdiction of an appeal by right from "[a] final judgment or final order of the circuit court, or court of claims, as defined in MCR 7.202(6)." MCR 7.203(A)(1). In pertinent part, MCR 7.202(6)(a) defines a "final judgment" or "final order" in a civil action as

(i) the first judgment or order that disposes of all the claims and adjudicates the rights and liabilities of all the parties, including such an order entered after reversal of an earlier final judgment or order,

\* \* \*

(iv) a postjudgment order awarding or denying attorney fees and costs under MCR 2.403, 2.405, 2.625 or other law or court rule, . . . [MCR 7.202(6)(a)(i), (iv)].

Docket No. 332454 is DTE's appeal from the court's March 24, 2016 order denying its motion for case evaluation sanctions including attorney fees and costs. The March 24 order followed the court's March 21 final orders of judgment as to the Botts and State Farm. Docket No. 332454 therefore is an appeal of a postjudgment order denying attorney fees under MCR 2.403. MCR 7.202(6)(a)(iv). When the appeal is from a postjudgment order regarding attorney fees or costs under MCR 7.202(6)(a)(iv), the appeal "is limited to the portion of the order with respect to which there is an appeal of right." MCR 7.203(A)(1). Accordingly, the Court's review of the appeal in Docket No. 332454 is limited to review of the trial court's decision to deny DTE case evaluation sanctions. That decision involved the application of MCR 2.403.

The court's February 24, 2016 opinion and order awarding State Farm RFA costs and attorney fees was not appealable by right because it did not adjudicate all the claims and rights of the parties. MCR 2.604.[10] DTE could have, but did not, file an application for leave to appeal the February 24 order. The February 24 order became part of the court's March 21, 2016 final judgment related to State Farm.[11] The March 21, 2016 final judgment is appealed from in Docket No. 333281. Docket No. 333281 is therefore the appeal in which DTE should have challenged the court's decision to award RFA fees and costs.

DTE argues in its reply brief that the arguments challenging the February 24 order are included in Docket No. 333281 by reference. In accord with MCR 7.212(7), appellant's brief must contain the arguments as to each issue in that brief. This Court will not search for appellant's authority elsewhere. Further required is a statement of the questions involved in the appeal. Docket No. 333281 does not state in the questions involved that the appeal involves DTE's challenge to the trial court's decision to grant State Farm RFA costs and attorney fees.

## B. DTE'S REQUEST FOR CASE EVALUATION SANCTIONS

### 1. STANDARD OF REVIEW

---

[10] MCR 2.604 provides:

(A) Except as provided in subrule (B), an order or other form of decision adjudicating fewer than all the claims, or the rights and liabilities of fewer than all the parties, does not terminate the action as to any of the claims or parties, and the order is subject to revision before entry of final judgment adjudicating all the claims and the rights and liabilities of all the parties. Such an order or other form of decision is not appealable as of right before entry of final judgment. A party may file an application for leave to appeal from such an order.

(B) In receivership and similar actions, the court may direct that an order entered before adjudication of all of the claims and rights and liabilities of all the parties constitutes a final order on an express determination that there is no just reason for delay.

[11] Recall the trial court denied RFA fees and costs to the Botts because they were not a requesting party.

-16-

"This Court reviews de novo a trial court's decision to grant case-evaluation sanctions." *MEEMIC Ins Co v DTE Energy Co*, 292 Mich App 278, 283; 807 NW2d 407 (2011). We review for an abuse of discretion the amount of case evaluation sanctions, including the amount awarded as reasonable attorney fees. *McNeel v Farm Bureau Gen Ins Co of Mich*, 289 Mich App 76, 97; 795 NW2d 205 (2010); *Ayre v Outlaw Decoys, Inc*, 256 Mich App 517, 520; 664 NW2d 263 (2003).

The interpretation of statutes and court rules are questions of law this Court reviews de novo. *Colista v Thomas,* 241 Mich App 529, 534-535; 616 NW2d 249 (2000).

## 2. ANALYSIS

Relevant to the issue of RFA sanctions is whether the court erred in adding the "expenses incurred in making that proof, including attorney fees" to adjust the verdict under MCR 2.403(O) which in turn declared State Farm the prevailing party entitled to case evaluation sanctions. MCR 2.313(C). We find that the court did so err in making the adjustment.

MCR 2.403 provides the framework for case evaluation in Michigan. *MEEMIC Ins Co*, 292 Mich App at 283. Under MCR 2.403(A)(1), "[a] court may submit to case evaluation any civil action in which the relief sought is primarily money damages or division of property." "During case evaluation, the parties submit and argue a concise summary of their factual and legal positions to a panel of three independent evaluators." *Merc Bank Mtg Co, LLC v NGPCP/BRYS Ctr, LLC*, 305 Mich App 215, 223; 852 NW2d 210 (2014). The panel then recommends a monetary award based on its evaluation of the case. MCR 2.403(K)(1). Each party may choose to accept or reject the evaluation award. MCR 2.403(K), (L). If the evaluation of the panel is rejected, the case proceeds to trial. MCR 2.403(N)(1). According to MCR 2.403(O),

> (1) If a party has rejected an evaluation and the action proceeds to verdict, that party must pay the opposing party's actual costs unless the verdict is more favorable to the rejecting party than the case evaluation. However, if the opposing party has also rejected the evaluation, a party is entitled to costs only if the verdict is more favorable to that party than the case evaluation.
>
> (2) For the purpose of this rule "verdict" includes,
>
>> (a) a jury verdict,
>>
>> (b) a judgment by the court after a nonjury trial,
>>
>> (c) a judgment entered as a result of a ruling on a motion after rejection of the case evaluation.
>
> (3) For the purpose of subrule (O)(1), a verdict must be adjusted by adding to it assessable costs and interest on the amount of the verdict from the filing of the complaint to the date of the case evaluation, and, if applicable, by making the adjustment of future damages as provided by MCL 600.6306. After this adjustment, the verdict is considered more favorable to a defendant if it is more

-17-

than 10 percent below the evaluation, and is considered more favorable to the plaintiff if it is more than 10 percent above the evaluation. If the evaluation was zero, a verdict finding that a defendant is not liable to the plaintiff shall be deemed more favorable to the defendant.

The party with the more favorable verdict is considered the "prevailing party" and is entitled to recover its actual costs. MCR 2.403(O)(6). The court rule defines "actual costs" as "costs taxable in any civil action, and . . . a reasonable attorney fee . . . for services necessitated by the rejection of the case evaluation." MCR 2.403(O)(6).

In this case, State Farm rejected the case evaluation award of $150,000 and chose to proceed to trial. After subtracting 25% for Mrs. Bott's comparative negligence, the jury verdict for State Farm was $156,096.79. In accord with MCR 2.403(O)(3), in order to be more favorable than the case evaluation award, the verdict must have been at least $165,000 which was "more than 10 percent above the evaluation." The trial court was authorized to adjust the verdict by adding assessable costs and interest. "[I]n adjusting a verdict under MCR 2.403(O)(3), assessable costs are limited to those incurred between the filing of the complaint and the date of the mediation evaluation or case evaluation." *Dessart v Burak*, 470 Mich 37, 42; 678 NW2d 615 (2004). Interest of $6,454.64, as ordered by the court, increased the verdict to $162,551.43. Assessable costs incurred from the time of the complaint filing on May 16, 2014, until June 6, 2015, when the case evaluation reward was rejected were approximately $511, resulting in a net verdict of approximately $163,062.43. Under MCR 2.403(O)(3), the verdict was not more favorable to State Farm.

The trial court erred when it also added $23,557.27 for costs and expenses, and $55,720 in reasonable attorney fees related to State Farm's post-trial motion for DTE's failure to answer RFAs to the judgment. Only assessable costs and interest may be used to adjust the verdict under MCR 2.403(O)(3) for purposes of determining the prevailing party entitled to case evaluation sanctions. The discovery sanction under MCR 2.313(C) was not an assessable cost under MCR 2.403(O), but rather related to DTE's failure to admit the truth of matters requested under MCR 2.312. Discovery sanctions are punitive measures for failure to comply with discovery while "the purpose of the mediation sanction provisions is not to act as a punitive measure but rather is intended to foster settlement." *Dessart v Burak*, 252 Mich App 490, 498; 652 NW2d 669 (2002), aff'd 470 Mich 37; 678 NW2d 615 (2004). "[A]ttorney fees, whether incurred before or after the mediation evaluation, are not an element of 'assessable costs' under MCR 2.403(O)(3)" either. *Dessart*, 470 Mich at 42.[12] DTE is therefore entitled to case

---

[12] See *Dessart v Burak*, 470 Mich at 42:

As such, the term "costs" ordinarily does not encompass attorney fees unless the statute or court rule specifically defines "costs" as including attorney fees. For example, MCR 2.403(O)(6) provides that "actual costs" include "(a) those costs taxable in any civil action, and (b) a reasonable attorney fee...." MCR 2.403(O)(6), however, does not define "assessable costs" as including attorney fees. We conclude, therefore, that attorney fees are not included in "assessable costs" under MCR 2.403(O)(3).

evaluation sanctions, which are its actual costs under MCR 2.403(O)(1), (6), *Id*. at 499, including "costs taxable in any civil action" and a "reasonable attorney fee."[13]

## C. REMITTITUR

### 1. STANDARD OF REVIEW

We review for an abuse of discretion a trial court's decision regarding remittitur. *Campbell v Human Services Dep't*, 286 Mich App 230, 243; 780 NW2d 586 (2009). "An abuse of discretion occurs when a court chooses an outcome that is outside the range of principled outcomes." *Heaton v Benton Const Co*, 286 Mich App 528, 538; 780 NW2d 618 (2009).

### 2. ANALYSIS

In the event that we did not grant DTE a new trial,[14] DTE requests remittitur of the damages awarded to State Farm for the Botts' residence, specifically, a reduction from $83,737.30 to $53,000 based on the appraisal of its real estate expert Norman Thomas.

We consider the following factors when deciding whether remittitur under MCR 2.611(E) would be proper in a particular case:

> 1) whether the verdict 'shocks the judicial conscience'; 2) whether the verdict was the result of improper methods, prejudice, passion, partiality, sympathy, corruption, or mistake of law or fact; 3) whether the verdict was within the limits of what reasonable minds would deem just compensation for the injury sustained; 4) whether the amount actually awarded is comparable to awards in similar cases within the state and in other jurisdictions. [*Palenkas v Beaumont Hosp*, 432 Mich 527, 532; 443 NW2d 354 (1989)].

"The only consideration expressly authorized by MCR 2.611(E)(1), however, is whether the jury award is supported by the evidence." *Palenkas*, 432 Mich at 532. In this case, it is.

DTE offered real estate appraiser Thomas to support its determination that the fair market value of the Bott's residence pre-fire was $53,000. Thomas's testimony and appraisal report were not supportive of his appraisal determination, however. Thomas was clear that he only

---

[13] We "read MCR 2.625(B)(2) and MCR 2.403(O)(6) together to conclude that the party entitled to actual costs under the mediation rule for a cause of action shall also be deemed the prevailing party under MCR 2.625(B)(2) on the entire record." *Forest City Enterprises, Inc v Leemon Oil Co*, 228 Mich App 57, 81; 577 NW2d 150 (1998)

[14] DTE also requests a new trial with each claim of error. MCR 2.611(A) provides the grounds for which a new trial may be granted. In this case, the only error we recognized was the trial court's addition of costs and attorney fees related to DTE's failure to answer RFAs to adjust the verdict under MCR 2.403(O)(3). This error does not warrant a new trial under the court rule and is correctable on remand.

compared structures and not the land upon which the structure was situated. He could not deny however, that location affected the cost of a home. Further, the comparables Thomas used, outside of the bank sale, were well over his $53,000 appraisal for the Botts' residence. State Farm claims representative Brett Liggitt's testimony supported an appraisal of the Botts' residence at $218,768.11 after depreciation. Using the information provided by Thomas, the jury verdict of $83,737.30 could be found "within the limits of what reasonable minds would deem just compensation for the injury sustained." *Id*. Remittitur was improper because the jury award was supported by the evidence.

DTE also requests remittitur of the entire judgment for the Botts. DTE claims that the Botts were already made whole under their insurance policy and should not be allowed to recover double damages. In the alternative, it requests the Botts' recovery be limited to what DTE considered the only uninsured loss due to a policy limit, an item of jewelry for $1,110.64, that DTE argues should be further reduced to $832.98 after the 25% comparative fault is applied.

Trial testimony supported the Botts' award of damages for their real and personal property losses. Again, the value of the home was within the reasonable limits of what a jury would have compensated. As to the award for personal property, Mrs. Bott testified that she did not guess as to the amount and value of items lost. Rather, she spent four months compiling a 108-page list of the personal property destroyed by the fire. The list of items claimed was double-checked by State Farm claims representative Latoya Smith. Smith also researched the costs of over 1,000 items on the internet, and applied depreciation to each item to generate the actual cash value.

DTE still argues that the Botts were initially given a check for the actual cash value of destroyed items and after they replaced the item with their own money, they were reimbursed the cost of replacement. DTE contends these payments made the Botts whole and that further payment from DTE for the same would constitute double damages. DTE bases this argument on Smith's agreement that because the Botts had a replacement costs policy, State Farm paid their replacement costs after the items were replaced. There is reason to believe from the trial record that Smith either misspoke or was misunderstood, because she testified to the contrary on two other occasions. Viewing the testimony as a whole and in context, it does not support DTE's argument that the Botts would be doubly compensated if this Court were to allow the verdict to stand.

## V. CONCLUSION

In docket number 332454, we affirm the trial court's decision to grant State Farm RFA sanctions, reverse its order denying DTE case evaluation sanctions, and remand for a determination of DTE's actual costs and fees according to MCR 2.403(O)(1) and (6). In docket number 333281, we affirm the judgment on the jury verdict and the expenses permitted under MCR 2.313(C), we reverse the part of the judgment awarding State Farm actual costs, including taxable costs and the interest calculated thereon awarded pursuant to MCR 2.403 and MCR 2.625(B)(2), and we remand for correction of the judgment. In docket number 333287, we affirm the judgment on the jury verdict, we reverse the part of the judgment awarding the Botts

taxable costs and interest, and remand for correction of the judgment. We do not retain jurisdiction.

/s/ Kathleen Jansen
/s/ Cynthia Diane Stephens